## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| JUSTICE HINTON,<br>Plaintiff, | :<br>:<br>: | CASE NO. 3:21-cv-863 (MPS) |
| v. | :<br>: | |
| PEARSON, et al.,<br>Defendants. | :<br>:<br>: | OCTOBER 4, 2021 |

---

## ORDER

Plaintiff Justice Hinton, incarcerated at MacDougall-Walker Correctional Institution in Suffield, Connecticut, filed this case under 42 U.S.C. § 1983.  The plaintiff names twelve defendants[1]: Lieutenant Pearson, Lieutenant Rangel, Warden Martin, Correctional Officer Conrad, Correctional Officer St. Jean, Correctional Officer McGregor, Correctional Officer Rosado, Correctional Officer Clapp, Unit Manager Ocasio, Lieutenant Dumas, Nurse Jillian Bellman, and Nurse Supervisor Phillips.  The plaintiff contends that the defendants violated his rights under the First and Eighth Amendments.  He seeks damages as well as declaratory and injunctive relief from the defendants in their individual capacities.

The Court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief.  28

---

[1] Although not included in the case caption, the plaintiff lists Officer John Doe as a defendant in the body of the Complaint.  The Court considers Officer Doe to be a defendant in this case and directs the Clerk to add Officer Doe as a defendant.

U.S.C. § 1915A.  This requirement applies to all prisoner filings regardless whether the prisoner

pays the filing fee.  *Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 159 (D. Conn. 2005) (citing

*Carr v. Dvorin*, 171 F.3d 115 (2d Cir. 1999) (per curiam)).  Here, the plaintiff paid the filing fee.

Although detailed allegations are not required, the complaint must include sufficient facts

to afford the defendants fair notice of the claims and the grounds upon which they are based and

to demonstrate a plausible right to relief.  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-56 (2007).

Conclusory allegations are not sufficient.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The

plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."

*Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when a plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted).

"Although courts must interpret a pro se complaint liberally, the complaint will be

dismissed unless it includes sufficient factual allegations to meet the standard of facial

plausibility."  *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations omitted).

I.    <u>Allegations</u>

The plaintiff has been designated a member of the Security Risk Group ("SRG") Bloods.

ECF No. 1 ¶ 24.  Inmates designated as SRG members must complete a five-phase SRG

Program.  *Id.* ¶ 25.  Each phase has distinct living arrangements, restrictions, and privileges with

each phase less restrictive.  *Id.*  Each phase takes a minimum of sixty days to complete, longer if

the inmate receives a disciplinary report.  *Id.* ¶ 26.

The plaintiff is considered a "two-timer" as he completed the program once before.  *Id.* ¶

27.  As such, he must remain disciplinary-report free for a minimum of two years before he can

return to general population.  *Id.*

In June 2019, the plaintiff was transferred from MacDougall-Walker Correctional Institution to Corrigan Correctional Institution.  *Id.* ¶ 28.  He had remained disciplinary-report free for nearly six months and was progressing to the next phase of the SRG Program.  *Id.*  The plaintiff was housed in B-pod with other SRG members in Phases 3-5 of the Program.  *Id.* ¶ 29.  The inmates were required to share a cell with an inmate from a different SRG, were subject to daily random cell searches, and were body-frisked upon exiting the cell.  *Id.*  The plaintiff alleges that the restrictions were enforced arbitrarily and in a discriminatory manner.  *Id.* ¶ 30.  He contends that officers vandalized the cells during the searches to torture and harass the inmates regardless of their SRG affiliations.  *Id.*  The correctional officers were primarily Caucasian while the inmates were predominately African-American or Hispanic.  *Id.* ¶ 31.

Following the death of George Floyd and the activities by the Black Lives Matter movement, tensions increased within Corrigan.  *Id.* ¶¶ 32-33.  Shakedowns were more frequent, recreation time was shorter, and there were more frequent lockdowns.  *Id.* ¶ 33.

On June 30, 2020, between 10:00 p.m. and 11:00 p.m., the plaintiff was in his cell watching television and preparing for bed when he heard a disruption in the unit.  *Id.* ¶ 35.  He went to the cell door and saw two nurses.  *Id.* ¶ 36.  One nurse was new and attractive.  *Id.*  The plaintiff began talking to another inmate who complimented the nurse's appearance.  *Id.* ¶ 37.  The plaintiff responded with an "equally vanilla" compliment of his own.  *Id.*

Officer St. Jean escorted the nurses "out of the cell" and immediately returned and asked the plaintiff why he was banging.  *Id.* ¶ 38.  The plaintiff alleges that he was not banging and believed Officer St. Jean's action intentional as there were many inmates at their cell doors.  *Id.*

Officer St. Jean considered the plaintiff's denial to be a "wisecrack" and ordered the plaintiff to go to the sally port while he conducted a shakedown of the plaintiff's cell.  *Id.* ¶ 39.  The plaintiff complied with the order and waited in the sally port for 45 minutes while his cell was searched.  *Id.* ¶ 40.  The plaintiff noticed that the lights in the unit were not turned on at any time during the search even though procedure is to turn the lights on so the surveillance camera can record the search.  *Id.*

When the correctional officers came to the sally port to retrieve the plaintiff, they had several of his electronic items which they claimed did not have the plaintiff's name inscribed on them.  *Id.* ¶ 41.  The plaintiff had the receipts to prove he purchased the items in the commissary and believed that matter would be rectified and the items returned to him.  *Id.* ¶¶ 41-42.

The plaintiff found his cell in "shambles."  *Id.* ¶ 43.  Commissary boxes had been opened and poured onto the floor and new sealed food items were opened and scattered about.  *Id.* ¶ 44.  His family photos had been removed from the album.  *Id.* When the plaintiff asked the officers to "fix" his cell, Officer St. Jean ordered the plaintiff to "shut up" and enter his cell.  *Id.* ¶ 45.  At this time, the plaintiff was surrounded by three officers, defendants St. Jean and McGregor and Officer Brolanger.  *Id.*

The plaintiff said he did not want any trouble but insisted that a lieutenant be called to the scene to address the issue.  *Id.* ¶ 46.  Officer St. Jean interpreted the plaintiff's request as a refusal to comply with his order and grabbed the plaintiff by the wrist.  *Id.* ¶ 47.  The plaintiff, who suffers from PTSD, tensed and pulled his arm away.  *Id.* ¶ 48.  The plaintiff felt a hand hit the side of his head before a code was called.  *Id.* ¶ 49.  The plaintiff used his arms to block his face and could not identify the officers striking him.  *Id.*  Once he was taken to the ground, he

4

was kicked, kneed, punched, and "eye-gouged." *Id.*   The officers told the plaintiff to put his hands behind his back and continued to strike him. *Id.* The plaintiff believes these strikes were to support a claim that he was resisting the officers. *Id.* The plaintiff alleges that he did not intentionally try to punch any officer and was not flailing his arms so he did not accidently hit any officer. *Id.*

Despite the plaintiff's claims of asthma and verification in his medical records, a chemical agent was deployed in his eyes and mouth. *Id.* ¶ 50. Lieutenant Rangel deployed the chemical agent. *Id.* ¶ 53. The plaintiff "repeatedly said that he couldn't breathe." *Id.* ¶ 50. While he was being struck, the officers made racial remarks toward the plaintiff. *Id.* ¶ 51. The officers ordered the plaintiff to stop resisting and stop spitting. *Id.* ¶ 52. The plaintiff alleges that the chemical agent caused him difficulty swallowing and saliva dripped from his mouth. *Id.* However, his face was pointing downward at all time and he denies spitting. *Id.*   The officers placed a spit veil over the plaintiff's face. *Id.* ¶ 53. During decontamination, the veil was not fully removed before Officer Clapp applied vey hot water to the plaintiff's face. *Id.* ¶ 54.

Following the incident, the plaintiff was taken to the Restrictive Housing Unit ("RHU"). *Id.* ¶ 57. Although a mental health worker is supposed to examine a prisoner to determine whether RHU placement is appropriate, this procedure is performed at Corrigan by a nurse, not a social worker. *Id.* ¶ 58. Nurse Bellman reported on the plaintiff's medical condition after the incident. *Id.* ¶ 59. She asked him mental health questions rather than treating his injuries. *Id.* ¶ 60. The plaintiff was disoriented from the effects of the chemical agent and could not think clearly. *Id.* ¶ 61. He had his head down because mucus was pouring from his nose and was not told to look at the camera when pictures were taken of his injuries. *Id.* Thus, the pictures show

5

only the top of his head.  *Id.*  The plaintiff first saw his injuries after repeatedly washing his eyes

with water from the sink in his cell.  *Id.* ¶ 62.

At 12:30 a.m. the next morning, the plaintiff received an allegedly false disciplinary

report for assault on staff, the first disciplinary report he had received in his eighteen months of

incarceration.  *Id.* ¶ 63.  The plaintiff has no history of violent behavior as an adult offender.  *Id.*

¶ 64.  If he has any violent history, it was as a juvenile.  *Id.*  The plaintiff also was charged and

fingerprinted by the state police.  *Id.* ¶ 66.  He was found guilty of the disciplinary charge.  *Id.*

In the following days, the plaintiff submitted numerous requests regarding the failure to

treat and document his injuries.  *Id.* ¶ 67.  On July 12, 2020, the plaintiff lost consciousness and

hit his head, allegedly from weakness following the assault.  *Id.* ¶ 68.  When he regained

consciousness, he pressed the emergency call button but got no response. *Id.* ¶ 69.  The plaintiff

submitted a request to Supervisor Phillips but received no response.  *Id.* ¶ 70.

## II.   Analysis

The plaintiff asserts six causes of action: (1) a First Amendment retaliation claim against

Lieutenants Rangel and Pearson; (2) a First Amendment retaliation claim against Officers St.

Jean, Conrad, and McGregor; (3) a state law claim for intentional infliction of emotional distress

against Officers St. Jean, McGregor, Conrad, and Doe and Lieutenants Rangel and Pearson; (4) a

claim for use of excessive force against Officers St. Jean, McGregor, Conrad, and Doe and

Lieutenants Rangel and Pearson; (5) a claim for deliberate indifference to serious medical needs

against Nurse Bellman and Nurse Supervisor Phillips[2]; and (6) a supervisory liability claim

---

[2] The plaintiff labels the two sections encompassing his fourth and fifth claims as the Fourth Cause of Action.

against Warden Martin and Lieutenants Rangel and Pearson.

A. Defendants Ocasio and Dumas

The plaintiff lists Unit Manager Ocasio and Lieutenant Dumas as defendants but includes no allegations against them and does not name them in any of his causes of action. The plaintiff attaches copies of Inmate Requests he sent to Ocasio and Dumas, ECF No. 1 at 34, 38, but these requests relate to the disciplinary hearing and finding which are not the subject of any claims in this case. Thus, Ocasio and Rangel are dismissed as defendants in this case.

B. Retaliation

The plaintiff includes two retaliation claims, one premised on his request to call a lieutenant to the cell and the other premised on his comment to another inmate about the nurse. To state a cognizable First Amendment retaliation claim, the plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Burns v. Martuscello*, 890 F.3d 77, 84 (2d Cir. 2018) (quoting *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 201) (internal quotation marks omitted)). The adverse action must have been sufficiently serious that it would deter a similarly situated person of ordinary firmness from exercising his right to speech. *See id.* at 93-94. "Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002), *as recognized by Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009). Courts consider the circumstances of the particular case when evaluating the second element. *Id.* (finding that the definition of adverse action "is not static across contexts," but "must be tailored

to the different circumstances in which retaliation claims arise"). "Prisoners may be required to tolerate more than public employees ... before a retaliatory action taken against them is considered adverse." *Id.* (internal quotation marks, alteration, and citation omitted). A prisoner pursuing a retaliation claim may not rest on "wholly conclusory" allegations, but rather must allege "specific and detailed" supporting facts. *Dolan*, 794 F.3d at 295 (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)).

The plaintiff asserts two retaliation claims, the first based on his verbal request for a lieutenant and the second based on his comment about the nurse. Filing grievances is protected activity that satisfies the first element. *See Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) ("It is well established that retaliation against a prisoner for pursuing a grievance violates the right to petition [the] government for redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983." (internal quotation marks and citations omitted)); *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (seeking redress of grievances in judicial or administrative forum is protected activity). "Although some district courts have found that verbal complaints may be protected for the purposes of a First Amendment retaliation claim, the Second Circuit has yet to articulate a bright line rule regarding the constitutionally protected oral speech by an inmate." *Cosby v. McDonald*, No. 3:20-cv-432(MPS), 2020 WL 5026550, at *6 (D. Conn. Aug. 25, 2020) (internal quotation marks and citation omitted). In considering an inmate's oral speech, the district courts have distinguished verbal complaints about the conduct of correctional officials or conditions of confinement and verbal arguments or confrontations between a prisoner and correctional staff. *Id. See, e.g., Miller v. Lamont*, No. 3:20-cv-872(MPS), 2020 WL 6136300, at *8 (D. Conn. Oct. 19, 2020) ("courts have distinguished

8

between oral grievances and oral confrontations or arguments between a prisoner and a correctional officer and have concluded that the latter do not constitute protected speech" (citing cases)).

Here, in the first retaliation claim, the plaintiff alleges that Officer St. Jean ordered him to enter his cell.  Rather than complying with the order, the plaintiff requested that a lieutenant be called.  Although the plaintiff may have intended to complain about Officer St. Jean to the lieutenant, the speech at issue is more in the nature of a confrontation or argument.  Thus, it does not constitute protected speech to support a retaliation claim.  *See, e.g., Rossi v. Goord*, No. 00-CV-1521, 2006 WL 2811505, at *10 n.16 (N.D.N.Y. Sept. 28, 2006) ("The questioning by an inmate of a lawful order given by a corrections officer, however, does not constitute protected speech deserving of First Amendment protection.") (citing *Rodriguez v. Phillips*, 66 F.3d 470, 478-79 (2d Cir, 1995)), *reconsideration granted in part on other grounds*, 2007 WL 952051 (N.D.N.Y. Mar. 29, 2007).  The first retaliation claim is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

In his second retaliation claim, the plaintiff contends that his cell was "vandalized" because he complimented the nurse in a conversation with another inmate.  ECF No. 1 at 24.  Cases asserting retaliation claims for inmate statements generally concern complaints made to prison officials regarding the conduct of correctional officers or prison conditions.  *See Riddick v. Arnone*, No. 3:11-cv-631(SRU), 2012 WL 2716355, at *7 (D. Conn. July 9, 2012).  However, the Second Circuit has recently held that a prisoner stated a valid retaliation claim based on comments made in out-going correspondence to a third party.  *See Bacon v. Phelps*, 961 F.3d

533, 542-45 (2d Cir. 2020) (recognizing claim but holding that defendants were protected by qualified immunity).

In *Bacon*, the prisoner was punished for using threatening or inappropriate language.  In a private letter to his sister, the prisoner expressed his attraction to a correctional officer using language that was not profane, abusive, or threatening.  *Id.* at 543.  The Second Circuit emphasized the non-threatening language and the fact that the prisoner did not express his feelings to the officer or anyone in the facility.  *Id.   Cf. Jackson v. Onondaga Cty.*, 549 F. Supp. 2d 204, 215-16 (N.D.N.Y. 2008) (profane and confrontational language and conduct directed to correctional officer not protected speech); *Esclara v. Charwand*, No. 9:04-CV-0983(FJS/DEP), 2008 WL 699273, at *6-7 (N.D.N.Y. May 12, 2008) (talking loudly in prison dormitory where correctional officer was strict about noise not speech protected by First Amendment); *Brown v. Busch*, 954 F. Supp. 588, 597-98 (W.D.N.Y. 1997) (to support First Amendment violation prisoner must show that restriction on right to communicate with other inmate was not reasonably related to legitimate penological interest).

Prisoners do not have "a First Amendment right to speak freely and communicate with other inmates and prison officials [] without restriction based on legitimate penological concerns."  *Esclara*, 2008 WL 699273 at *7.  Determining whether the plaintiff's speech was protected in this case is difficult at this stage of litigation.  Although the plaintiff alleges that he made his "vanilla' comment to another inmate and not the nurse, he alleges that she was standing outside his cell and could have heard the exchange. Without the exact language used, the court cannot determine whether the plaintiff's speech was innocuous or could be perceived as

threatening or inappropriate.  However, even if his statement merits First Amendment protection, the plaintiff fails to establish the required causal connection to support a retaliation claim.

The plaintiff alleges that after escorting the nurse from the housing unit, Officer St. Jean returned and asked the plaintiff why he was banging on his cell door.  The plaintiff specifically alleges that Officer St. Jean considered his response to the question to be a "wise crack" and because of the response, searched his cell.  ECF No. 1 ¶ 39.  Thus, the plaintiff alleges that the response to the question, not his comment to another inmate, was the reason his cell was searched.  Accordingly, the plaintiff fails to state a cognizable retaliation claim based on his comment to the other inmate.

C.  Use of Excessive Force

The plaintiff contends that Officers St. Jean, McGregor, Conrad and Lieutenants Rangel and Pearson used excessive force against him by assaulting him and using a chemical agent on June 30, 2020.  He alleges that Officers St. Jean and McGregor were present when he requested the lieutenant and, after the use of force commenced, other officers responded to a code.  He also alleges that Lieutenant Rangel deployed the chemical agent.  The plaintiff alleges that he was hit repeatedly about the head and, when he fell to the grounds, was hit, kicked, and kneed over his entire body.  He was covering his face with his arms and could not tell identify the officers using force against him.

To state a claim for use of excessive force in violation of the Eighth Amendment, the plaintiff must allege facts establishing objective and subjective components.  *See Sims v. Artuz*, 230 F.3d 14, 20-21 (2d Cir. 2000).  The objective component focuses on the harm done to the prisoner in light of contemporary standards of decency.  The amount of harm required depends

on the nature of the claim.  *Id.* at 21.  Although some degree of injury is usually required, the prisoner need not show that he suffered a significant injury to state a claim for use of excessive force.  *See Wilkins v. Gaddy*, 559 U.S. 34, 34 (2010) ("[T]he use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury.") (quoting *Hudson v. McMillian*, 503 U.S. 1, 4 (1992)).  However, "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'"  *Id.* at 37 (quoting *Hudson*, 503 U.S. at 9).  The subjective component of the excessive force standard requires a showing that the use of force was "carried out 'maliciously and sadistically' rather than as part of 'a good faith effort to maintain or restore discipline.'"  *Id.* at 40 (quoting *Hudson*, 503 U.S. at 9).

The extent of the inmate's injuries is one factor the court may use to determine whether correctional staff could "plausibly" have considered the force necessary in a particular situation. *Hudson*, 503 U.S. at 7.  Other factors include "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response."  *Id.* (internal quotation marks and citation omitted).

The plaintiff does not describe his injuries in his statement of facts.  He attaches to the Complaint an Inmate Request in which he described his injuries as "knots" overlapping his left eye, on his right forehead, and scattered over the top of his head, a blackened left eyelid, a minor laceration under his left eye, and soreness.  ECF No. 1 at 39.  He alleges that he lost consciousness nearly two weeks after the incident as a result of weakness from the use of force. Thus, it appears that the plaintiff suffered some injuries.  Regarding the need for force, the

plaintiff concedes that he pulled away from Officer St. Jean but attributes the response to PTSD. He alleges that he did not intentionally strike any officer. Construing the facts in the light most favorable to the plaintiff, the Court will permit the excessive force claim to proceed against defendants St. Jean, McGregor, Conrad, Doe, and Pearson for further development of the record.

The plaintiff also alleges that Lieutenant Rangel deployed a chemical agent even though the plaintiff said that he suffered from asthma. The use of a chemical agent against an inmate may constitute the use of excessive force. *See, e.g., Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010) (concluding that "a reasonable juror could find that the use of pepper spray deployed mere inches away from the face of a defendant already in handcuffs and offering no further active resistance constituted an unreasonable use of force").

The plaintiff alleges that Lieutenant Rangel deployed the chemical agent into his eyes and mouth. He states that he suffers from asthma but does not indicate that there was a contraindication for use of a chemical agent in his medical records. The plaintiff alleges that he was not resisting the officers. As using a chemical agent against a compliant inmate has been considered a use of excessive force, this claim also will proceed for further development of the record. *See Bowman v. Dilworth*, No. 3:20-cv-756(CSH), 2021 WL 2551142, at *8 (D. Conn. June 22, 2021) (allegations that a chemical agent was used against a compliant inmate states plausible claim for use of excessive force).

### D. Deliberate Indifference to Serious Medical Needs

The plaintiff alleges that Nurse Bellman and Nurse Supervisor Phillips were deliberately indifferent to his serious medical needs because they did not treat his injuries.

The Eighth Amendment forbids deliberate indifference to prisoners' serious medical needs. *Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). To state a claim for deliberate indifference to a serious medical need, the plaintiff must allege facts showing both that his need was serious, and that the defendants acted with a sufficiently culpable state of mind. *See Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

There are both objective and subjective components to the deliberate indifference standard. Objectively, the alleged deprivation must be "sufficiently serious." *Spavone*, 719 F.3d at 138. A "sufficiently serious" deprivation can exist if the plaintiff suffers from an urgent medical condition that is capable of causing death, degeneration, or extreme or chronic pain. *See Brock v. Wright*, 315 F.3d 158, 162–63 (2d Cir. 2003); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). A medical condition may not initially be serious, but may become serious because it is degenerative and, if left untreated or neglected for a long period of time, will "result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136–37 (2d Cir. 2000). The Second Circuit has identified several factors that are "highly relevant" to the question of whether a medical condition is sufficiently serious, including "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

The defendants also must have been "subjectively reckless." *Spavone*, 719 F.3d at 138. They must have been actually aware of a substantial risk that the plaintiff would suffer serious

14

harm as a result of their actions or inactions.  The defendants "need only be aware of the risk of harm, not intend harm.  And awareness may be proven 'from the very fact that the risk was obvious.'"  *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).

Negligence that would support a claim for medical malpractice does not rise to the level of deliberate indifference and is not cognizable under section 1983.  *See Salahuddin*, 467 F.3d at 279-80.  "[A]n official's failure to alleviate a significant risk that he should have perceived but did not" does not constitute deliberate indifference.  *Farmer*, 511 U.S. at 838.  Nor does a disagreement over the treatment provided show deliberate indifference.  *See Wright v. Rao*, 622 F. App'x 46, 47 (2d Cir. 2015) (citing *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)); *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("It has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment …. [T]he essential test is one of medical necessity and not one simply of desirability." (internal quotation marks and citations omitted)).

The plaintiff describes his injuries as "knots" over his head, a blackened eyelid, a minor laceration, and soreness.  Courts generally find that injuries of this type do not rise to the level of a serious medical need to support an Eighth Amendment claim.  *See, e.g., Garcia v. Furnia*, No. 9:12-CV-0924(GTS/ATB), 2014 WL 4685104, at *4 (N.D.N.Y. Sept. 14, 2014) (body soreness, black eye, and headache do not constitute serious medical need as a matter of law) (citing cases); *Jones v. Furman*, No. 02-CV-939F, 2007 WL 894218, at *10 (W.D.N.Y. Mar. 21, 2007) (soreness, pain in ear, lumps behind ear and on back of head, abrasions, and bruising are not serious medical needs to support an Eighth Amendment claim).  As the plaintiff fails to allege

facts showing that his injuries rise to the level of a serious medical need, his claims for deliberate indifference to serious medical needs are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

Further, the only allegation regarding Nurse Supervisor Phillips is that she failed to respond to a request.   As defendant Phillips is a nurse supervisor, the Court assumes that the plaintiff was complaining about her subordinates in the request.  Thus, the request is in the nature of a grievance.  The plaintiff has no constitutional right to have his grievances addressed or to receive a timely, or what he considers a proper, response.  *See Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018) (claim relating to grievance procedures "confused a state-created procedural entitlement with a constitutional right"; "neither state policies nor 'state statutes … create federally protected due process entitlements to specific state-mandated procedures'") (quoting *Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003)).

E.  Supervisory Liability

The plaintiff includes a claim for supervisory liability against Warden Martin and Lieutenants Rangel and Pearson.  He alleges that they created or permitted the continuance of a policy under which he was injured and failed to correct unconstitutional practices.

The Second Circuit has recently clarified the standard to be applied to a claim of supervisory liability.  *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020).  Prior to the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit had identified five categories of conduct that would establish liability of supervisors for the conduct of a subordinate in a section 1983 action, three of which were creation of a policy under which unconstitutional acts occurred, failure to address the unconstitutional acts when informed such acts were occurring, and failure to supervise subordinates who committed the acts.  *Id.* at 616.

16

In *Iqbal,* the Supreme Court rejected a theory of supervisory liability that permitted a supervisor to be "held liable based on a lesser showing of culpability than the constitutional violation requires."  *Id*. at 617 (quoting *Iqbal,* 556 U.S. at 677) (internal quotation marks omitted).  In *Tangreti*, the Second Circuit adopted this view and held that, "after *Iqbal*, there is no special rule for supervisory liability.  Instead, a plaintiff must plead and prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Id.* at 618 (quoting *Iqbal*, 556 U.S. at 676).  Thus, the plaintiff must plead and prove that Warden Martin and Lieutenants Rangel and Pearson were personally aware of and disregarded the alleged constitutional violations.

The plaintiff alleges no facts suggesting that Warden Martin was personally aware of the incident while it was occurring.  The plaintiff does submit a request that he sent to Warden Martin about a week after the incident.  Although the request mentions the incident, the relief requested concerns the disciplinary charge, which is not the subject of claims in this case.  Nor does the plaintiff provide evidence that Warden Martin personally received and read the request.  *See Lopez v. Chappius*, 2021 WL 859384, at *2 (W.D.N.Y. Mar. 8, 2021) (receipt of communication insufficient to show personal involvement; "Even before *Tangreti*, it was 'well-established that a supervisor's failure to respond to a letter of complaint does not provide a sufficient basis to find the defendant was personally involved in the deprivation alleged.'") (citations omitted).  The claim against Warden Martin is dismissed.

As noted above, the plaintiff alleges that Lieutenant Rangel deployed the chemical agent. He also suggests that Lieutenant Pearson was present during the use of force.  Thus, they were personally involved in the incident.  The claims against Lieutenants Person and Rangel will

proceed.

  F. <u>Intentional Infliction of Emotional Distress</u>

  The plaintiff asserts a state law claim for intentional infliction of emotional distress against Officers St. Jean, McGregor, Conrad, and Doe and Lieutenants Rangel and Pearson. Although the plaintiff incorporates all prior allegations into this claim, the fact that he names the same defendants he alleges used excessive force against him in this claim suggests that his claim is that the use of force was intended to cause emotional distress.

  To state a claim for intentional infliction of emotional distress, a plaintiff must establish four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Board of Educ. Of Town of Stonington*, 254 Conn. 205, 210, 757 A.2d 1059, 1062 (2000) (internal quotation marks and citation omitted). To be held liable for intentional infliction of emotional distress, one's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 210-11 (internal quotation marks and citation omitted).

  The standard in Connecticut to demonstrate extreme and outrageous conduct is "stringent." *Huff v. W. Haven Bd. of Educ.*, 10 F. Supp. 2d 117, 122 (D. Conn. 1998). "[E]xtreme and outrageous" conduct is defined as that which "exceed[s] all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause,

mental distress of a very serious kind." *DeLaurentis v. New Haven*, 220 Conn. 225, 267, 597 A.2d 807, 828 (1991).

In his claim, the plaintiff merely recites the elements of the tort. In his statement of facts, the only allegations suggesting mental distress are that he was "devastated" when he first viewed his face, ECF No. 1 ¶ 62, and that racist remarks made while force was being used "cut the plaintiff deep." *Id.* ¶ 51. These statements do not show mental distress of a very serious kind required to support a claim for intentional infliction of emotional distress. The claims of intentional infliction of emotional distress asserted against the defendants are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

G. Declaratory and Injunctive Relief

Finally, although the plaintiff names the defendants in their individual capacities only, he seeks declaratory and injunctive relief in addition to damages.

Declaratory relief serves to "settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationship." *Colabella v. American Inst. of Certified Pub. Accountants*, 2011 WL 4532132, at *22 (E.D.N.Y. Sept. 28, 2011) (citation omitted). As such, "[d]eclaratory relief operates prospectively to enable parties to adjudicate claims before either side suffers great damages." *Orr v. Waterbury Police Dep't*, 2018 WL 780218, at *7 (D. Conn. Feb. 8, 2018). In *Orr*, the court dismissed the request for declaratory judgment that the defendants had violated the plaintiff's Fourth Amendment rights during his arrest because the request "concern[ed] past actions." *Id.* The plaintiff seeks declaratory relief based on past actions, asking the Court to declare that the actions alleged violated his constitutional rights. Thus, the request for

declaratory relief is dismissed.

The plaintiff also seeks an injunction, a form of prospective relief. However, claims for prospective relief against a state official may be asserted against the official in his official capacity only. *See Patterson v. Lichtenstein*, 2020 WL 837359, at *2 (D. Conn. Feb. 20, 2020) (injunctive relief is not available from the defendants in their individual capacities) (citing *Arzuaga v. Quiros*, 2015 WL 13021466, at *1 (D. Conn. Nov. 9, 2015)); *Kuck v. Danaher*, 822 F. Supp. 2d 109, 143 (D. Conn. 2011) (defendants lack authority to provide injunctive relief in their individual capacities). This is so because, as individuals, the defendants are not authorized to take actions on behalf of the state. The plaintiff has named the defendants only in their individual capacities. Thus, the plaintiff's request for injunctive relief is dismissed.

III.   Conclusion

The claims for retaliation, deliberate indifference to serious medical needs, supervisory liability against Warden Martin, and intentional infliction of emotional distress, as well as the requests for declaratory and injunctive relief, are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1). The requests for declaratory and injunctive relief also dismissed. As all claims against them have been dismissed, the Clerk is directed to terminate Warden Martin, Officer Rosado, Officer Clapp, Unit Manager Occasio, Lieutenant Dumas, Nurse Bellman, and Nurse Supervisor Phillips as defendants in this case.

The case will proceed on the federal claims for use of excessive force against defendants Pearson, Rangel, St. Jean, McGregor, Conrad, and Doe in their individual capacities.

The Clerk is directed to add Officer Doe as a defendant in this case. Before service can be effected and the claim proceed against defendant Doe, however, the plaintiff must identify

him.

The court enters the following additional orders.

(1)     As the plaintiff paid the filing fee to commence this action, he is directed to effect service of the Complaint and this Order on defendants Pearson, Rangel, St. Jean, McGregor, and Conrad in their individual capacities and file a return of service within **ninety (90) days** of the date of this order.  Failure to do so will result in the dismissal of this action.  The plaintiff also shall identify and effect service on Officer Doe within that same ninety-day period.  The plaintiff shall file a notice indicating the date on which he mailed the notice of lawsuit and waiver of service of summons forms to the defendants and shall file the waiver of service of summons forms when he receives them.  If any defendant fails to return a signed waiver of service of summons form, the plaintiff shall arrange for in-person service on the defendant in accordance with Federal Rule of Civil Procedure 4.

(2)     T**he Clerk shall** send the plaintiff a copy of this Order, instructions on effecting service, notice of lawsuit forms and waiver of service of summons forms.  The Clerk shall add Officer Doe to the caption as a defendant.

(3)     **The Clerk shall** send a courtesy copy of the Complaint and this Order to the Connecticut Attorney General and the Department of Correction Office of Legal Affairs.

(4)     The defendants shall file their response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the waiver forms are sent.  If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claim recited above.  They also may include all additional defenses permitted by the Federal Rules.

(5)     Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be

21

completed within **seven months (210 days)** from the date of this order.  Discovery requests need

not be filed with the court.

(6)     All motions for summary judgment shall be filed within **eight months (240 days)**

from the date of this order.

(7)     Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a

dispositive motion within twenty-one (21) days of the date the motion was filed.  If no response

is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(8)     If the plaintiff changes his address at any time during the litigation of this case,

Local Court Rule 83.1(c)2 provides that he MUST notify the court.  Failure to do so can result in

the dismissal of the case.  The plaintiff must give notice of a new address even if he is

incarcerated.  The plaintiff should write PLEASE NOTE MY NEW ADDRESS on the notice.  It

is not enough to just put the new address on a letter without indicating that it is a new address.  If

the plaintiff has more than one pending case, he should indicate all the case numbers in the

notification of change of address.  The plaintiff should also notify the defendants or the attorney

for the defendants of his new address.

(9)     The plaintiff shall utilize the Prisoner Efiling Program when filing documents

with the court.  The plaintiff is advised that the Program may be used only to file documents with

the court. As local court rules provide that discovery requests are not filed with the court,

discovery requests must be served on defendants' counsel by regular mail.

(10)     The Clerk shall immediately enter the District of Connecticut Standing Order Re:

Initial Discovery Disclosures concerning cases initiated by self-represented inmates and shall

send a copy to the plaintiff.

**SO ORDERED** this    4th day of October 2021 at Hartford, Connecticut.

                                   /s/

                               Michael P. Shea
                               United States District Judge